CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

FEB 16 2010

JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| MARILYN F. TRUMAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action No. 7:08cv584 |
| v. | ) |
| | ) |
| MICHAEL J. ASTRUE, | ) By: Michael F. Urbanski |
| Commissioner of Social Security, | ) United States Magistrate Judge |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

Plaintiff Marilyn F. Truman ("Truman") brought this action for review of the Commissioner of Social Security's ("Commissioner's") decision denying her claim for disability insurance benefits under the Social Security Act (the "Act"). On appeal, Truman argues that the Administrative Law Judge ("ALJ") erred by failing to give controlling weight to the disability opinion of her treating physician, Dr. Zimmer. After carefully reviewing the entirety of Truman's administrative record and medical history, the court finds that the ALJ's evaluation of Truman's physical and mental impairments is supported by substantial evidence. As such, the Commissioner's decision must be affirmed.

I

Section 405(g) of Title 42 of the United States Code authorizes judicial review of the Commissioner's denial of social security benefits. Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). "'Under the Social Security Act, [a reviewing court] must uphold the factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the correct, legal standard.'" Id. (alteration in original) (quoting Craig v. Chater, 76 F.3d 585,

589 (4th Cir. 1996)). "Although we review the [Commissioner's] factual findings only to establish that they are supported by substantial evidence, we also must assure that [his] ultimate conclusions are legally correct." Myers v. Califano, 611 F.2d 980, 982 (4th Cir. 1980).

The court may neither undertake a de novo review of the Commissioner's decision nor re-weigh the evidence of record. Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992). Judicial review of disability cases is limited to determining whether substantial evidence supports the Commissioner's conclusion that the plaintiff failed to satisfy the Act's entitlement conditions. See Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966). Evidence is substantial when, considering the record as a whole, it might be deemed adequate to support a conclusion by a reasonable mind, Richardson v. Perales, 402 U.S. 389, 401 (1971), or when it would be sufficient to refuse a directed verdict in a jury trial. Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996). Substantial evidence is not a "large or considerable amount of evidence," Pierce v. Underwood, 487 U.S. 552, 565 (1988), but is more than a mere scintilla and somewhat less than a preponderance. Perales, 402 U.S. at 401. If the Commissioner's decision is supported by substantial evidence, it must be affirmed. 42 U.S.C. § 405(g); Perales, 402 U.S. at 401.

"Disability" is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The "[d]etermination of eligibility for social security benefits involves a five-step inquiry." Walls v. Barnhart, 296 F.3d 287, 290 (4th Cir. 2002). This inquiry asks whether the claimant (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his or her past relevant work; and if not, (5) whether he or she can perform other work. Heckler v.

2

Campbell, 461 U.S. 458, 460-462 (1983); Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (citing 20 C.F.R. § 404.1520). If the Commissioner conclusively finds the claimant "disabled" or "not disabled" at any point in the five-step process, he does not proceed to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Once the claimant has established a prima facie case for disability, the burden then shifts to the Commissioner to establish that the claimant maintains the residual functional capacity ("RFC"),[1] considering the claimant's age, education, work experience, and impairments, to perform alternative work that exists in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

## II

Truman was born in 1963, (Administrative Record, hereinafter "R." 88), and has had limited education. She attended Special Education classes in reading and math and dropped out of school after the eighth grade at age 15. (R. 379.) Truman has not attempted to obtain a GED, but she can read, write, and drive a car. Truman worked as an upholsterer from 1984 until 2001, when she injured her back picking up a chair at work. Apparently, after her injury, but before Truman was able to return to work, she was laid off. (R. 175.) Between May, 2003 and September, 2004, Truman worked as a telemarketer out of her home. (R. 125.) Truman alleges a disability onset date of September 9, 2004, due to low back pain, hip pain, chronic fatigue,

---

[1] RFC is a measurement of the most a claimant can do despite his limitations. See 20 C.F.R. §§ 404.1545(a), 416.945(a). According to the Social Security Administration:

> RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule.

Social Security Regulation (SSR) 96-8p. RFC is to be determined by the ALJ only after he considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain). See 20 C.F.R. §§ 404.1529(a), 416.929(a).

3

anxiety, and depression. Her application for benefits was rejected by the Commissioner initially and again upon reconsideration. An administrative hearing was convened before an ALJ on August 23, 2006. (R. 460.) In determining whether Truman was disabled under the Act, the ALJ found that her back pain constituted a severe impairment, but concluded that her claimed chronic fatigue, anxiety, and depression were not severe. (R. 17-18.) The ALJ concluded that Truman could return to her work as a telemarketer. (R. 22.)

Although the ALJ decided this case on November 22, 2006, the Appeals Council did not take action for nearly two years. On September 25, 2008, it denied Truman's request for review. This appeal was filed in federal court on November 12, 2008, and following summary judgment briefing, a hearing was held on October 19, 2009.

### III

Truman argues that the ALJ erred by not giving controlling weight to her treating physician, Dr. Zimmer. A treating physician's opinion is to be given controlling weight if it is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); Social Security Ruling 96-2p. The ALJ is to consider a number of factors, which include whether the physician has examined the applicant, the existence of an ongoing physician-patient relationship, the diagnostic and clinical support for the opinion, the opinion's consistency with the record, and whether the physician is a specialist. 20 C.F.R. §§ 404.1527(d), 416.927(d). A treating physician's opinion cannot be rejected absent "persuasive contrary evidence," and the ALJ must provide her reasons for giving a treating physician's opinion certain weight or explain why he discounted a physician's opinion. Mastro, 270 F.3d at 178.

4

Truman had been seen by Dr. Zimmer since her injury in 2001, but he did not provide a permanent disability opinion until June, 2006. On June 12, 2006, Dr. Zimmer noted Truman's severe back pain and resulting depression. After reciting her various medications, Dr. Zimmer tersely concluded that "[s]he is certainly not able to work even in a sedentary job." (R. 406.) No further explanation was provided. At her next appointment six weeks later on July 31, 2006, which is the last visit to Dr. Zimmer documented in the record, Truman denied having any depression, anxiety, or other emotional issues. (R. 431.) Remarkably, although there were no concerns of depression or anxiety at this visit, Dr. Zimmer wrote a letter less than a month later, on August 22, 2006, citing Dr. Joseph I. Leizer's psychological evaluation and opining that "Truman is disabled from competitive employment." (R. 459.)

These statements by Dr. Zimmer are precisely the types of conclusory statements that amount to a disability determination, not a medical opinion entitled to controlling weight under the treating physician rule. A determination of disability is a decision reserved to the Commissioner and, as such, these statements are not entitled to any special significance. 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1), (3). Dr. Zimmer's conclusory disability opinion is given without explanation and lacks support from the record. In fact, this opinion is contrary to his office note of October 3, 2002, which states that Truman "can do a sedentary job," and a letter dated April 21, 2003, in which Dr. Zimmer notes that she is able to work six hours per day.

In his decision, the ALJ reviewed Dr. Zimmer's clinical findings and gave a thorough and accurate discussion of the other objective evidence of record. This evidence includes the findings of Truman's treating pain doctor, Dr. G. Samarasinghe, as well as reports from numerous consultative examinations. Indeed, the Virginia Department of Rehabilitative Services referred Truman to Dr. William Humphries for a physical consultative examination,

because the medical record failed to include specific observations and diagnostic results to explain Truman's pain. (R. 17.) Additionally, Disability Determination Services referred Truman to Belinda Overstreet, Ph.D. for a mental status examination, and Truman's counsel scheduled a consultative psychological evaluation with Joseph I. Leizer, Ph.D. Moreover, "[b]ecause of the discrepancies and inconsistency in the medical record" (R. 21), the ALJ called Dr. Charles Cooke to testify as a medical expert at the administrative hearing.

The ALJ considered all of this evidence, as well as the findings of the state agency physicians, in determining that Truman is not disabled. When you read the ALJ's decision in its entirety, it is clear that he gave Dr. Zimmer's disability opinion little weight because it is inconsistent with these consultative reports and the other objective evidence of record. There is ample evidence to support the ALJ's conclusion that Truman is not disabled from all work. The undersigned summarizes this evidence below, addressing Truman's physical and mental impairments in turn.

## A.

The Commissioner's evaluation of Truman's physical impairments is supported by substantial evidence. The ALJ reviewed the medical records from Dr. Zimmer and Dr. Samarasinghe and concluded that she could do sedentary work. Indeed, Dr. Zimmer opined as much in 2002 and 2003. (R. 163, 210.) A lumbar spine MRI taken on April 30, 2004 was normal. (R. 353.) Dr. Samarasinghe noted in Truman's May 17, 2004 visit that "I have reviewed the films myself. The pictures don't look bad at all. There are no structural changes consistent with her symptoms." (R. 339.) The note from Truman's next visit to Dr. Samarasinghe reflects his concern "about her long-term use of narcotics and would like to switch her over to an anti-inflammatory regimen." (R. 337.) He also recommended self-directed

exercise. (R. 339.) The ALJ considered the February 11, 2005 evaluation by Dr. Humphries, who opined that Truman was able to work. Reviewing state agency physicians confirmed Dr. Humphries' assessment. (R. 371-77.)

As a result of "discrepancies and inconsistency in the medical record," (R. 21), the ALJ asked Dr. Cooke to review Truman's medical history and attend the administrative hearing as a medical expert. The ALJ relied upon the opinion of Dr. Cooke that there was little objective evidence to explain the claimed extent of Truman's back problems. As Dr. Cooke recounted in substantial detail, Truman suffered from inflammation of the sacroiliac joints, and the bulk of her objective testing showed only normal or unremarkable findings. (R. 496-502.) He observed that her neurological examinations were consistently normal and unremarkable (R. 488-92), and that objective testing done in 2001 revealed degenerative disc disease and osteoarthritis in Truman's low back and minimal disc bulging at L5-S1. (R. 488.) Dr. Cooke noted that since that time, Truman was treated with several narcotic pain medications, including methadone, oxycodone, lidoderm and hydrocodone.[2] (R. 127.) Dr. Cooke's testimony confirms the opinions of the state agency physicians and the examining consulting physician, Dr. Humphries, all of whom concluded that Truman was capable of working.

Taken together, these opinions provide substantial evidence supporting the ALJ's conclusion that Truman is capable of sedentary work as a telemarketer.[3] The ALJ's decision to

---

[2] This variety of pain medications was significant to the ALJ, who commented that "[m]y assessment of the claimant and the records is that she is magnifying her symptoms in order to obtain drugs." (R. 19.) As the ALJ noted, on July 5, 2006, Truman was discharged from the care of her pain management doctor, Dr. Samarasinghe, because she tested positive for hydrocodone which he was not prescribing for her. As mentioned in that letter, it appears that Truman was obtaining methadone and oxycodone from Dr. Samarasinghe and hydrocodone from Dr. Zimmer. (R. 442.)

[3] The ALJ also based his finding that Truman was physically and mentally capable of returning to work as a telemarketer on her "comments that she worked as a telemarketer only because she was told that she would lose her worker's compensation benefits if she did not do the job, but that when she was informed she could quit the job she did so immediately." (R. 21.)

credit the opinions of the state agency physicians, the consulting examining physician and the medical expert over the terse opinion of Dr. Zimmer is supported by the record. See Smith v. Schweiker, 795 F.2d 343, 346 (4th Cir. 1986) ("the testimony of a non-examining physician can be relied upon when it is consistent with the record" (quoting Kyle v. Cohen, 449 F.2d 489, 492 (4th Cir. 1971))).

Moreover, the ALJ also had the ability to hear Truman's testimony at the administrative hearing and found her complaints regarding her symptoms not to be entirely credible. (R. 20.) The ALJ "noted that a large portion of the medical record is based on the claimant's pain in the absence of specific diagnostic and examination findings." (R. 16.) The ALJ's credibility determinations are entitled to great weight. Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) ("Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight.") The court is charged with reviewing the record for substantial evidence. In doing so, the court must not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the ALJ. Craig v. Charter, 76 F.3d 585, 589 (4th Cir. 1996). Given the lack of objective findings and the opinions of multiple reviewing doctors, the undersigned finds that substantial evidence supports the ALJ's credibility determination in this case. See Johnson v. Barnhart, 434 F.3d 650, 658-59 (4th Cir. 2005).

Review of the entire record makes it clear that substantial evidence supports the Commissioner's decision that Truman's physical impairments do not render her disabled from all work.

**B.**

With respect to her mental impairments, Truman has been prescribed a variety of medications for anxiety and depression by Dr. Zimmer since 2001, although she has never received counseling or therapy, or otherwise been treated by a psychologist or psychiatrist. (R. 380, 452.) On August 22, 2006, Dr. Zimmer wrote a letter stating that he had reviewed the psychological evaluation of Dr. Joseph Leizer, agreed with it, and opined that Truman was disabled from competitive employment. (R. 459.) In his decision, the ALJ rejects the opinion of Dr. Joseph Leizer as "too disabling," in favor of the opinion of Drs. Belinda Overstreet and Howard S. Leizer, which he considered to be "more accurate." (R. 20.)

Truman was examined by Dr. Overstreet on March 7, 2005. Dr. Overstreet noted Truman's long history of anxiety and depression which are tied in with her chronic pain. In that regard, Dr. Overstreet noted that: "[i]f her pain is better managed Ms. Truman's psychological symptoms are likely to at least go into partial remission. Ms. Truman's prognosis would improve to fair if she obtained psychological treatment focusing on pain management and anxiety reduction. Without improvement in her control of pain or reduction of anxiety and depressive symptoms her prognosis is guarded." (R. 383.) Dr. Overstreet determined that Truman's Global Assessment of Functioning ("GAF") is 61.[4]

From a functional standpoint, Dr. Overstreet noted that Truman could understand, recall, and carry out simple instructions, as well as complex and detailed ones. She was able to make simple work decisions and to understand work rules. Dr. Overstreet noted mild concentration

---

[4] The GAF scale is a method of considering psychological, social and occupational function on a hypothetical continuum of mental health. The scale ranges from 0 to 100, with serious impairment in functioning at a score below 50, moderate difficulty in functioning at 60 or below, some functioning difficulty at 70 and below, and so forth. Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 1994). An individual with a score of 61 has some mild symptoms or some difficulty in social, occupational, or school functioning, but is generally functioning pretty well, and has some meaningful relationships. Id.

problems and some difficulty functioning independently. Dr. Overstreet stated that the "greatest impairment to maintaining work functioning appears to be the combination of her pain and her symptoms of anxiety and dsythymia. Ms. Truman's motivation is impaired and her energy level is low. She is likely to experience difficulty maintaining regular work attendance and persisting in work activities throughout the day." (R. 383.) In the last paragraph of her report, Dr. Overstreet concluded that "[h]er ability to behave in an emotionally stable manner is somewhat impaired. In a typical work setting, her psychological symptoms are likely to result in absences or tardiness due to her reported lack of task persistence and low energy level resulting in hypersomnia. She is likely to have some difficulties coping with the pace of a typical work environment and being in such environments is likely to exacerbate psychiatric symptoms." (R. 383.)

The ALJ found Dr. Overstreet's evaluation to be consistent with that of the state agency doctors who reviewed Truman's treatment records. State agency psychologists R. J. Milan, Jr. and Howard S. Leizer reviewed Truman's medical records and concluded that her impairments did "not prevent [her] from meeting the basic mental demands of competitive work on a sustained basis." (R. 386.) Their review of her records revealed the following:

> The claimant is able to maintain concentration and attention for extended periods of time, with no more than occasional disruptions attributable to her symptoms. She could be expected to complete a normal workday and work week without frequent exacerbations of her psychological symptoms. Also, she is able to maintain socially appropriate behavior and can perform the personal care functions needed to maintain an acceptable level of personal hygiene.
>
> She is capable of asking simple questions and accepting instruction. She is able to get along with others in the work place without distracting them. There are no significant restrictions in her abilities in regard to understanding and memory and adaptation.

(R. 386.)

Truman was examined by Dr. Joseph Leizer on June 20, 2005. Dr. Leizer administered the Minnesota Multiphasic Personality Inventory ("MMPI") and the Personality Assessment Inventory ("PAI"), and found the validity scales in these tests to reflect candid responses. Dr. Joseph Leizer's report describes the test results as follows:

> Her test profiles indicate a markedly anxious, despondent, angry and emotionally volatile woman, with poor self-esteem, little confidence in herself, a marked distrust towards others and very limited stress tolerance, who is so preoccupied with her own medical problems that she seems to ruminatively obsess about them. She not only appears to view her life as severely compromised by her physical functioning but she also seems to have little hope that her condition will ever materially improve.

(R. 455.)

Dr. Joseph Leizer pegged Truman's GAF at 45, a level far lower than that determined by Dr. Overstreet.[5] Dr. Joseph Leizer noted that her prognosis for significant improvement within the next twelve months was poor. (R. 456.) He agreed with Dr. Overstreet that Truman was able to understand and remember simple instructions. However, Dr. Joseph Leizer disagreed that Truman could follow detailed or complex instructions. Further, Dr. Joseph Leizer noted that Truman was able to concentrate on simple tasks for a short period of time (2 - 4 hours), but

---

[5] A GAF score of between 41-50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning. Truman cites no cases or regulations suggesting that a GAF score below 50 is determinative of disability. In fact, courts have held that the GAF scale is intended to be used to make treatment decisions, and nowhere do the Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on her GAF score. Wilkins v. Barnhart, 69 F. App'x 775, 780 (7th Cir. 2003). A GAF score may assist in the ALJ's determination of a claimant's residual functional capacity, but is not essential to such a determination. See, e.g, Lopez v. Barnhart, 78 F. App'x 675 (10th Cir. 2003); Ham v. Barnhart, No. 3:01cv368, 2002 U.S. Dist. LEXIS 25438, at *19 (E.D. Va. July 19, 2002) (finding a GAF of 50 not alone sufficient to render an individual unable to work).

11

sustained concentration and persistent task focus were markedly impaired. (R. 456.) Dr. Joseph Leizer noted problems in Truman's ability to handle stressful situations. (R. 457.)

The ALJ questioned the consistency and accuracy of Dr. Joseph Leizer's report. In particular, he noted the marked inconsistency between certain of Dr. Leizer's functional observations about Truman and the low GAF level he attributed to her. In particular, Dr. Joseph Leizer found that Truman was able to perform all activities necessary for independent living, was able to understand simple instructions and directions, was able to concentrate on simple tasks up to four hours, and was able to interact with others provided stress was minimized. Nevertheless, Dr. Joseph Leizer found Truman's GAF level to be in the serious range. (R. 19.)

It appears from the record that the ALJ did a thorough job of assessing Truman's mental impairment and assessing her depression and anxiety in light of the record evidence. The ALJ noted that Truman never sought any counseling or treatment for her anxiety and depression beyond the various medications prescribed by Dr. Zimmer. Careful examination of the treatment records from both of her principal treating physicians, Drs. Zimmer and Samarasinghe, do not suggest that Truman's mental health issues were disabling.

Indeed, under the heading "Mental Status Exam," Dr. Zimmer's medical records repeatedly reflect no depression, anxiety, or agitation. (4/25/05, R. 131; 3/24/05, R. 134; 8/25/04, R. 138; 6/25/04, R. 141; 2/2/04, R. 146; 8/19/03, R. 148; 4/7/03, R. 155; 1/31/03, R. 157; 10/3/02, R. 164; 5/31/02, R.167; 2/22/02, R. 171; 1/07/02, R. 199; 12/13/01, R. 177; 10/11/01, R. 182; 9/24/01, R.185). The few records that mention depression are rather unremarkable. For example, on July 1, 2003, Truman reported being more depressed, but on her next visit to Dr. Zimmer on August 19, 2003, he noted improvement with increased dosage of Lexapro. (R. 150, 152, 147.) A month later, on September 13, 2005, Dr. Zimmer notes that

12

Truman "denies depression, anxiety." (R. 409.) In fact, only one of Dr. Zimmer's office visit notes make more than a passing reference to depression. On June 12, 2006, Dr. Zimmer observed that her depression was exacerbated by her pain. In the same note, however, Dr. Zimmer states that Truman denied anxiety, memory loss, mental disturbance, suicidal ideation, hallucinations, and paranoia. (R. 407.)

Likewise, although Dr. Samarasinghe treated Truman for nearly three years, his treatment notes contain almost no reference to depression. The only note of substance, dated February 24, 2004, states that "[s]he is very disability focused. She is depressed." (R. 341.)

On this record, substantial evidence supports the Commissioner's determination that Truman's physical and mental impairments do not render her disabled from all work. The ALJ is required to analyze every medical opinion received and determine the weight to give to such an opinion in making a disability determination. 20 C.F.R. §§ 404.1527(d), 416.927(d). In this case, he considered the clinical findings of Truman's treating physicians, the reports from various consultative examinations, the medical expert testimony of Dr. Cooke, and Truman's testimony as to her limitations, in determining that she is not disabled from all work. The ALJ gave a thorough and accurate discussion of this evidence in his decision. He was justified in rejecting Dr. Zimmer's conclusory disability opinion in favor of the other objective evidence of record. As such, the Commissioner's decision must be affirmed.

V

At the end of the day, it is not the province of the reviewing court to make a disability determination. It is the court's role to determine whether the Commissioner's decision is supported by substantial evidence, and, in this case, substantial evidence supports the ALJ's decision. In recommending that the final decision of the Commissioner be affirmed, the court

does not suggest that Truman is totally free of any distress. The objective medical record simply fails to document the existence of any physical and mental conditions which would reasonably be expected to result in total disability from all forms of substantial gainful employment. It appears that the ALJ properly considered all of the objective and subjective evidence in adjudicating Truman's claim for benefits and in determining that her physical and mental impairments would not prevent her from performing any work. It follows that all facets of the Commissioner's decision in this case are supported by substantial evidence. Accordingly, the undersigned concludes that the Commissioner's decision must be affirmed and the defendant's motion for summary judgment **GRANTED**.

Enter this 16th day of February, 2010.

Michael F. Urbanski
United States Magistrate Judge